Carl E. Metz, et al. [1] v. Commissioner. Metz v. Commissioner
Docket Nos. 37524, 37525, 43054.
United States Tax Court
T.C. Memo 1955-303; 1955 Tax Ct. Memo LEXIS 33; 14 T.C.M. (CCH) 1166; T.C.M. (RIA) 55303; November 8, 1955
*33 An individual who was engaged principally in the construction and sale of row houses, also sold certain real properties which he had held for rental and other investment purposes. Held: (a) His gains from sales of certain apartment buildings which had been rented for more than 6 months are taxable under section 117(j), Internal Revenue Code (1939), as gains from the sale of real properties used in his rental business; (b) his gain from the sale of certain vacant land, not suitable for development in his construction business, is a long-term capital gain within the meaning of section 117(a); (c) his gains from sales of certain properties held primarily for use in his construction business are taxable as ordinary income under section 22(a); (d) his gain from the sale of certain vacant property which had been distributed to him as a partner in a subdivision project, and which he had continued to hold for sale to builders, is taxable as ordinary income under section 22(a); and (e) his gains from sales of certain vacant land which he acquired and held for investment without building thereon, are long-term capital gains within the meaning of section 117(a). 2. A corporation, organized *34 by the above-mentioned individual, constructed and operated for investment a large apartment project consisting of 48 units containing 104 apartments. An unfavorable earnings record prompted the corporation to liquidate the project by making separate sales of the units. Held, that the manner and the degree of sales activity were insufficient to change the investment purpose and to cause the units to be held primarily for sale to customers in the ordinary course of a real estate business. The gains realized were from sales of property held for use in the corporation's rental business, within the meaning of section 117(j). Clayton L. Burwell, Esq., and William J. Duiker, Esq., American Security Building, Washington, D.C., for the petitioners. Charles J. Hickey, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The three cases here involved, which have been consolidated, involve deficiencies in income tax determined by the respondent as follows: Docket
Taxable Year
No.
Ended
Deficiency
37524
Carl E. Metz
12/31/47
$17,771.09
37525
Carl E. Metz and
Helen Metz
12/31/48
4,693.80
12/31/49
11,335.95
Fiscal Year
Ended
43054
Stenton Gardens,
Inc.
6/30/47
2,910.91
6/30/48
11,231.71
6/30/49
1,422.23
Not all the adjustments set forth in the notices of deficiency have been contested; and certain issues raised in the pleadings have been eliminated by the parties. An issue raised in Docket No. 37524, respecting disallowance of deduction for a loss from alleged worthlessness of Timber Syndicate # 1 Units, was withdrawn by the petitioner at the hearing. And other issues raised in Docket *36 Nos. 37524 and 37525, respecting the proper treatment of an amount of $1,750, paid in settlement of a suit for real estate commissions, was eliminated by concession of the respondent in his brief that this amount should be added, in specified portions, to the cost basis of certain tracts of real estate. The results of such disposition of issues are hereby approved. The remaining issues for decision all involve a similar question: Whether certain items of real estate sold by one or another of the petitioners during the taxable years involved, were, at the time of the respective sales thereof, held by the particular seller primarily for sale to customers in the ordinary course of the seller's business, so as to cause the gain therefrom to be taxable as ordinary income; or whether such items of real estate were, at the time of their respective sales, either held by the seller for investment or for use in the seller's business, so as to cause the gain therefrom to be entitled to capital gain treatment under section 117 of the Internal Revenue Code (1939). Findings of Fact Some of the facts have been stipulated, and these are incorporated herein by reference. Petitioners Carl E. *37 Metz and Helen Metz are husband and wife, residing in Philadelphia, Pennsylvania. For the year 1947, Metz filed his individual income tax return with the collector of internal revenue for the first district of Pennsylvania; and for the years 1948 and 1949, he and his wife filed joint income tax returns with the same collector. The petitioner, Stenton Gardens, Inc., is a corporation organized under the laws of the Commonwealth of Pennsylvania on August 28, 1942, with its principal place of business in Philadelphia. It filed income tax returns for all years involved, likewise with the collector of internal revenue for the first district of Pennsylvania. Carl E. Metz (hereinafter called Metz) was, during all taxable years and also for about 18 years prior thereto, engaged in the business of buying parcels or tracts of real estate, constructing buildings thereon and then selling the improved properties to the public. He called himself an "operative builder." He specialized in the construction of row houses, but to a lesser extent in the construction of twin houses and stores. Until about the year 1946, he conducted all such business as an individual; but thereafter part of such business *38 was handled by a corporation, Carl Metz, Inc., of which he held about 90 per cent of the stock. Since 1929 he had built approximately 3,500 row houses, of which 750 to 1,000 were built subsequent to World War II. The houses were sold through a realtor, and everything possible was done to sell the houses as quickly as possible. Most of the houses were sold by the time construction was completed. The gains on these row houses sold by Metz and Carl Metz, Inc., are not involved in these proceedings. Metz never held himself out to the public as being engaged in any business other than that of an operative builder. He did, however, hold certain vacant parcels of land, and also various apartments and stores for rent. During the years here involved, he received gross rents from apartments and stores of between $17,000 and $21,000 annually. In 1947, 1948, and 1949, Metz sold the following properties, here involved, for the amounts of gain hereinafter indicated: Property
Gain
1947
Apartments - 1354 Weaver St.
$ 4,921.42
Apartments - 1331 Weaver St.
5,687.23
Land - Vernon Road Tract B
17,939.02
1948
Apartments - 1355 Weaver St.
5,194.63
Apartments - 1400 Sharpnack St.
5,268.83
Lots - Cliveden St.
310.28
Land - Stenton Ave.
3,891.45
Land - Stenton Ave.
63.18
Lot - Fayette & Upsal Sts.
852.01
Land - Vernon Road Tract B
4,103.42
1949
Land - Stenton Ave.
87.59
Land - Cottman & Bustleton Tract,
Eastwood St.
11,916.65
Land - Wainut Lane
14,660.44
Land - Vernon Road Tract B
15,615.15
*39 As to the Cliveden Street lots and the Fayette and Upsal Streets lot, which were sold in the year 1948, the petitioners have presented no evidence. The facts regarding the other properties shown in the above list are as follows: Weaver Street and Sharpnack Street Apartments In October 1945 Metz commenced the construction of 35 houses in the area of Weaver Street and Sharpnack Street, Philadelphia. Thirty-one of these houses were single-family units built for sale, the gains from which are not here involved. We are concerned only with the other 4 structures, which were apartments. Metz's previous experience had shown him that corner houses were hard to dispose of, so on each of the 4 corners of this project he built a multiple-family structure (called a "triplex," although some of such structures are identified in one of the notices of deficiency as a "duplex").These contained an apartment on each of 3 floors, the so-called basement apartment being level with the sidewalk. It was Metz's theory, even though he had never constructed any such buildings before, that holding these triplexes for rent would prove to be a good investment. The apartments were equipped with electric *40 ranges and electric refrigerators; whereas the 31 single-family houses were equipped only with electric ranges. The single-family houses were financed by short-term construction mortgages; while the 4 triplexes were financed by 15-year mortgages. The single-family houses were sold immediately upon completion, without any period of vacancy between the end of the construction and the sales; but the 4 triplexes were rented promptly upon their completion during 1946, and remained rented almost continuously until their sale in 1947 and 1948. Although the triplexes were not advertised for sale and no "for sale" signs were erected on them, a number of offers for purchase were received and rejected. In 1947 Metz decided to liquidate these triplexes, in order to make the proceeds available for his construction business. The 4 were sold between May 1947 and February 1948, without any sales promotion, through an independent realtor. Vernon Road Tract B On September 6, 1944, Metz purchased a plot of land which occupied three full blocks and one-half of each of two additional blocks. This tract, located on Vernon Road and hereinafter called "Tract B," was divided into two portions by intervening *41 property owned by a church; and it was situated immediately adjacent to another tract, known as Tract A, upon which Metz had previously been building. His belief was that, since the war was then progressing favorably, a resumption of building activity was to be anticipated, and that his future operations as a builder would be simplified if conducted on a tract contiguous to his Tract A project. Tract B contained three highly desirable street frontages on solid ground; but the balance, located on the other side of the church-owned property, was low ground running to several feet below grade, which would require filing before any buildings could be erected on it. In all his prior experience, Metz had never built upon filled ground, and he did not desire to do so in this case. At first he did not want to purchase the low part of Tract B; but the land was owned by an estate and the trustee insisted upon selling the entire parcel or none, so it was necessary for him to purchase the entire tract in order to get the more desirable portion. Also, since the estate was required to accept any higher bid that might be received, Metz found it necessary to make two or three increases of his original *42 offering price. Before offering the last increase, he was persuaded to continue only after the broker, Jones, had agreed to waive his commission of $3,500. In exchange for such waiver of commission, Jones received an assurance from Metz that he would be permitted to handle the property in the event of its sale. Metz planned to build only on the solid portion. He anticipated that the low portion would eventually be filled with dirt supplied from excavations dug by him and other builders in the area. He believed that, due to a growing shortage of rowhouse ground in that vicinity, this low portion of Tract B would appreciate in value. Following the incorporation of Carl Metz, Inc., in about 1946, Metz conveyed to this corporation approximately 37 per cent of Tract B, but he retained the low ground which comprised the remainder of the tract. Between 1944 and 1948, he or the corporation built row houses on the solid ground portions of Tract B, and also completed construction of similar houses on the adjoining Tract A, where work had been interrupted by the war. Although Metz received many calls from builders who were interested in purchasing the low ground, he consistently refused *43 to sell the same and did not put any "for sale" signs on the property or advertise it for sale. However, in July 1947 he concluded that the low ground, which by this time had been filled, should be sold, since the demand for it from other builders was great. Jones sold the property within a few minutes after receiving authorization Stenton Avenue Tract On September 29, 1947, Metz purchased property on Stenton Avenue in Philadelphia, known as the Stenton Avenue Tract. Most of this tract was vacant land, but a portion of it was occupied by a greenhouse and nursery. The entire property was zoned for and suitable for the building of duplex houses. Some years earlier, Metz had built several duplex houses in the immediate vicinity for all of which he had found a ready market. At the time of acquiring the present tract, he did not know whether or not he would use it for building purposes. The greenhouse and nursery had been operated by one Davis for about 25 years. Metz permitted Davis to rent this portion of the property until October 1948; and at that time, he sold the greenhouse site to Davis but required him to remove his shrubbery from the nursery portion. Metz would have preferred *44 to remove the greenhouse and keep the entire tract, but he made the sale to accommodate Davis. The sales price was $8,965 from which Metz derived a gain of $3,891.45. As regards the balance of the tract, Metz built several houses thereon. In 1948 and 1949, he sold two portions at $5,850 each and derived gains therefrom of $63.18 and $87.59, respectively. The evidence does not disclose the circumstances of these sales or the identity of the purchasers. Cottman and Bustleton Tract (Eastwood Street Property) In August 1946 Metz and another builder named Zerbey entered into a written partnership agreement to acquire, as partners, a tract of unimproved land at the corner of Bustleton Pike and Cottman Street in Philadelphia. The agreement recited that the property would be held "solely for investment purposes and resold as a unit or in blocks"; that title would be held by a realty company under declaration of trust for the account of the parties to the agreement; that the parties would make equal contributions to the capital of the partnership; and that the net profit or net loss would be divided equally. The property, at the time of acquisition, was zoned to permit construction *45 of twin houses; but Metz and Zerbey regarded it to be particularly suitable for row houses because of its topography, the fact that row-house development was moving toward it, and the fact that row houses had already been built within a distance of above five blocks. The partners bought the property with the intention of attempting to have it rezoned to permit the erection of row houses, which they considered to be more profitable than twin houses. Shortly after the financing of the property had been completed, Metz instituted action to have it rezoned for row-house construction. He contacted the zoning board and arranged to have a city ordinance introduced, which resulted in the property being rezoned to permit row houses to be built. The partners then worked out with the City Engineering Department a subdivision plan for a layout of streets and lots. This plan was approved by the district surveyor on June 23, 1948, and was filed with the Philadelphia authorities. The partners worked methodically to accomplish all this, so as to get the property ready for sale. Thereafter, the lots were offered for sale through two independent realtors, who specialized in ground sales. The offering *46 price for most of the properties was $25 per front foot; but on one street where a sewer had been installed in connection with a school, the price was $30 per front foot. The partners had purchased the property at a cost approximately $10 per front foot. No sales were made through the realtors. Shortly after the property had thus been offered for sale, Zerbey suggested that sales might be stimulated if he and Metz would construct some row houses. Metz, being a builder himself, did not wish to extend the partnership agreement to include the making of improvements with Zerbey as a co-builder. Plans were then discussed whereby Zerbey might withdraw some of the property for construction by him; but it finally was decided that each partner would withdraw a portion of the property for row-house construction on a separate basis. Accordingly, on May 5, 1949, two half blocks of the property facing on Eastwood Street were distributed from the partnership to Metz, and two other half blocks facing on Saul Street were distributed to Zerbey. At the time of such distribution, Metz did not intend to merely hold the property for himself but rather to erect row houses on it. Shortly thereafter, in *47 May 1949, he transferred the property to Carl Metz, Inc., of which he held substantially all the stock. The sale price was $25 per front foot; and it yielded Metz a gain of $11,916.65. Carl Metz, Inc. built row houses on the property which it received from Metz. Likewise, either Zerbey individually or a corporation which he controlled, built row houses on the property distributed by the partnership to Zerbey. Walnut Lane Tract On December 17, 1942, Metz purchased a parcel of vacant real estate in North Philadelphia, known as the Walnut Lane Tract. The tract covered 8 full blocks and portions of 4 other blocks, and it was located only a short distance from another large tract, known as Tract A, on which he was building at the time. The property was brought to Metz's attention by a real estate agent named Jones, and Metz considered it extremely well suited for row-house development because the surrounding area was completely built up with row houses. It was held by an estate, and was being offered at a price which he considered to be low. He anticipated that war conditions probably would cause a reduction in his building activity because of the shortage of men and material and *48 the restrictions on residential building. He felt that he could hold this vacant land until after the close of hostilities without risk of destruction, and that he could then either use it for building or could sell it to other developers. Jones waived his commission on the purchase, with the understanding that he would have the right to handle any subsequent sale of the property. This was the first parcel of vacant property which Metz had purchased, other than for immediate development. However, in July 1943, he purchased another narrow strip of property contiguous to this Walnut Land Tract. He did not advertise either of these properties for sale, and no "for sale" sign was placed on them. In June 1944, Metz sold a portion of the Walnut Lane Tract to an individual named Watkins, who was a bank officer; and on December 26, 1945, he sold the remainder of the tract on the installment basis to a construction company. Thereafter, a portion of the property included in each of these conveyances was acquired by the City of Philadelphia for playground purposes. On other portions of the property purchased by the construction company, row houses were erected. In Metz's 1944 income tax *49 return, he treated the gain from the sale to Watkins as capital gain; and this treatment was not challenged by the revenue agent in the audit of that return. In his returns for 1945 and 1949, Metz reported gains in respect of installment payments received on his sale to the construction company, and he again classified the gains as capital gains. The capital gain classification on the 1945 installment was not challenged; but on the audit of the 1949 return, the respondent determined that the gain was ordinary income. Stenton Gardens, Inc. - Pleasant Place Apartment Project For many years prior to 1942, Metz had desired to construct an apartment project as an investment, in order to provide himself with an income for life. With this in mind, he purchased a tract of land located in what was generally regarded as a good apartment area. The topography of the tract was not suitable for the erection of conventional row houses. He then caused Stenton Gardens, Inc., the petitioner in Docket No. 43054, to be organized in August 1942. The purposes stated in the corporation's charter were: "to purchase or otherwise acquire, hold, lay out, develop, manage, sell, exchange, mortgage, pledge, *50 lease and otherwise deal in real property of every nature and kind, and to erect, construct, build, repair, renew, remove, or remodel houses and buildings of all kinds and to transact all business necessary and incidental thereto." The corporation issued 640 shares of stock, with a par value of $50 per share, as follows: Carl E. Metz
550 shares
Helen Metz
80 shares
H. James Sautter
10 shares Of the 630 shares issued to Metz and his wife, 624 shares were issued, pursuant to resolution, in payment for the tract of land previously mentioned. At the first meeting of the corporation's board of directors, held in October 1942, the following officers were elected: Carl E. Metz
President and Treasurer
Helen Metz
Vice-President
H. James Sautter
Secretary These officers continued to serve throughout the taxable years here involved. During these years, Metz received a salary for managing the corporation's affairs, although the active management was left to a superintendent employed for such purpose. Stenton Gardens, Inc. completed construction of the apartment project (called Pleasant Place Project or Stenton Gardens Apartments) in February 1944, *51 at a cost of $450,000. The project consisted of 48 connected buildings or units, containing an aggregate of 104 separate apartments. The materials used in the construction were more expensive and of higher quality than those ordinarily employed in apartment buildings erected for sale. A master gas system with one meter and one large main running through the cellars of all the units was installed. Such central gas system entailed an additional cost to the corporation; but, because the system would permit the purchase of gas at wholesale, it was believed that a profit would be realized after the cost of installation had been recovered. Also, a separate heating plant was provided for each of the 104 apartments; whereas it was customary in constructing apartment buildings for sale, to install a single heating plant for each unit as a whole. Thirty of the units were privately financed through the New York Life Insurance Company under a blanket 15-year mortgage; the evidence does not show how the other 18 units were financed. All the apartments were rented immediately, on a yearly basis. Many of the tenants were engaged in national defense work. The corporation's net profits (or losses) *52 for the fiscal years ended June 30, 1946 through 1949, were as follows: Gross Receipts
Fiscal Year
from Rent and
Operating
Net Profit
Ended June 30
Sale of Gas
Expenses
(or loss)
1946
(not shown)
(not shown)
$5,000.00 (approx.)
1947
$73,930.25
$70,224.08
3,706.17
1948
49,650.80
55,693.52
6,042.72
1949
43,564.35
41,264.44
2,299.91
In October 1945, Government restrictions on occupancy and disposition of private defense housing were removed by order of the War Production Board and the National Housing Authority, but rent ceilings were retained. Vigorous appeals were made to the local and regional OPA offices for an increase in the project's rent ceilings; but these appeals were not successful. In January 1947, after the corporation's accountant had advised that the project was not a sound investment because of the fixed rentals and the ever present danger of vacancies, the corporation determined that it would sell its apartments. It decided to sell the apartment units separately, because a market for the entire project was not available, due to the unsatisfactory earnings record. Letters were thereupon sent to the tenants, revealing *53 the decision to sell and offering them the first opportunity to purchase the units at prices ranging from $12,500 to $17,500. Similar letters were sent to numerous non-tenants who had previously made offers for purchase that had been rejected. A sample unfurnished apartment, which had been renovated, was opened for display purposes, but no salesman was stationed in it. No "for sale" signs were placed on or about the property, and the corporation did not advertise the apartments for sale. One real estate broker who had inserted an advertisement in a newspaper was reprimanded and instructed to refrain from such advertising. No tenant was requested to vacate, and none was required to move, in order to effect a sale. A unit was offered for sale only after one or more of the apartments therein had become vacant. In order to dispose of the units individually, it became necessary to make arrangements with the mortgagee to release from the blanket mortgage each unit which might be sold; and such an arrangement was effected. Also, it became necessary, in order to sell the units separately, to arrange for the installation of a separate gas meter in each apartment, and to create easements which *54 would permit each apartment to use the central gas main; and such arrangements were made. Most, but not all, sales of the units were handled by one Hodgkins, an independent realtor, who had an office of his own within the project. Other brokers cooperated with Hodgkins on sales, or made sales themselves. The corporation's officers did not confer with prospective purchasers. The sales of units in the taxable years involved, were as follows: Fiscal
Number
Year
of
Sold
Sold
Ended
Units
to
to Non-
Sale
June 30
Sold
Tenants
tenants
Proceeds
1947
7
3
4
$ 86,000
1948
23
2
21
289,300
1949
5
0
5
66,950
Totals
35
5
30
$442,250
The remaining 13 units were disposed of after the taxable years as follows: Fiscal
Number
Year
of
Sold
Sold
Ended
Units
to
to Non-
Sale
June 30
Sold
Tenants
tenants
Proceeds
1950
1
0
1
$ 13,000
1951
1
0
1
13,000
1952
7
0
7
103,500
1953
4
0
4
70,500
Totals
13
0
13
$200,000
The sales proceeds from all units were used by the corporation to acquire land, 5 stores and a shopping center, for long-term holding. Opinion The problem presented *55 here is whether gains from sales of certain real properties are taxable as ordinary income, as contended by the respondent, or whether such gains are entitled to capital gain treatment under section 117 of the Internal Revenue Code (1939), as contended by the petitioners. The properties involved are 4 tracts of vacant land and 4 triplex apartment buildings, sold by Metz; and several other apartments, sold by Stenton Gardens, Inc.
Carl E. Metz had been an operative builder in Philadelphia since 1929, engaged principally in constructing row houses on and purchased for that purpose, and selling the same to the public. He also held real properties, in his own name and in the names of 2 corporations controlled by him, for rental and other investment purposes. Thus he was both a dealer and an investor in real estate - a dual role which we have previously recognized. See D. L. Phillips, 24 T.C. -, (June 22, 1955); Walter R. Crabtree, 20 T.C. 841; Nelson A. Farry, 13 T.C. 8. We must determine therefore, in dealing with the present problem, whether each particular property was, at the time of its sale, held for investment or use in the petitioner's business, or *56 whether it was then held primarily for sale to customers in the ordinary course of a real estate business. As has been stated frequently, the problem is essentially a factual one, dependent on the precise facts and circumstances surrounding the particular transaction. See Curtis Co., 23 T.C. 740, and cases cited therein at page 750. Among the factors which have been considered by the courts in dealing with such a problem, although no one factor is decisive, are: The purpose for which the property was acquired originally; the frequency, continuity and substantiality of the sales; the degree of activity exercised by the taxpayer or those acting under him, in effecting the sales; and whether the primary purpose of the sales was to make profit by carrying on a substantial part of the activities of a person engaged in the real estate business, or merely to liquidate the taxpayer's holdings. See Alice E. Cohn, 21 T.C. 90; Walter R. Crabtree, supra.It is particularly important to consider the purpose for which the property was held immediately prior to its sale. Carl Marks & Co. Inc., 12 T.C. 1196; Walter R. Crabtree, supra. *57 The courts have recognized that, even though the property was held originally for investment purposes, the method of its liquidation may be such as to constitute the carrying on of a real estate business. Curtis Co., supra. With these general principles in mind, we turn to a consideration of the particular properties involved. Weaver Street and Sharpnack Street Apartments The facts heretofore found by us respecting these triplex apartment buildings compel the conclusion that they were originally built by Metz for rental purposes, rather than for sale to customers in the ordinary course of his business as an operative builder, and that they continued to be so held by him until the time of their respective sales. The motives which actuated their construction, the long-term financing, the manner in which they were equipped, and the fact that they all were actually rented, support such conclusion. Also, Metz's limited activity in liquidating these triplexes did not, in our opinion, assume the proportions of a real estate business. There were only 4 sales extending over a 9-month period. It is our further opinion, however, that the extent of Metz's activities in renting *58 apartments and stores, was sufficient to put him in the rental business; and that the triplex apartments were, at the time of their sale, property used by him in such rental business. Accordingly, we hold that the gains derived from the sales of these triplex apartment buildings are entitled to be taxed under section 117(j), as gains from sales of real property used by Metz in his rental business and held for more than 6 months. Nelson A. Farry, supra.
Vernon Road Tract B Our findings respecting this Tract B show that the low ground portion of the tract was not, either at the time of its purchase or subsequently, intended by Metz to be built upon by him. He acquired and held this low portion as an investment, with the belief that when filled from nearby excavations, it would appreciate in value by virtue of the demands from others who were willing to build on filled ground. Also, his liquidation of such investment was accomplished in one sale, a few minutes after his decision to sell was communicated to the broker. We hold that the gain realized from the sale, which was reported by Metz and his wife on the installment basis in 1947, 1948, and 1949, was realized *59 from property held for investment, and not for sale to customers in the ordinary course of Metz's business as an operative builder. Accordingly, such gain is taxable as long-term capital gain within the meaning of section 117(a). Cf. Ben L. Carroll, 21 B.T.A. 724 (1930). The situation here is not comparable to that in George J. Wibbelsman, 12 T.C. 1022 (1949), wherein both the desirable and undesirable portions of the property were held alike, for sale to customers. Stenton Avenue Tract As shown in our findings of fact, this property was, at the time of its purchase, particularly well suited for the construction of duplex houses. Metz, as an operative builder, had previously built houses of this character in the immediate vicinity, and had found a ready market for them. These circumstances, together with the fact that he actually built duplex houses on a portion of this property, lead us to conclude that, at the time of the sales here involved, he was holding this entire tract for development and sale to customers in the ordinary course of his construction business. The sale of the greenhouse site was consistent with Metz's plan to sell all portions *60 of the tract after their improvement; for the greenhouse site was already improved and a customer was available. We regard the temporary rental of the greenhouse and nursery as a mere stop-gap arrangement, which operated until the sale to the then occupant was effected. Cf. Rubino v. Commissioner, (C.A. 9, 1951), 186 Fed. (2d) 304, affirming per curiam a Memorandum Opinion of this Court [8 TCM 1085]. As regards the two other sales of portions of this tract in 1948 and 1949, there is no evidence regarding them which indicates any departure from the above-mentioned plan to develop and sell the several portions of the tract to customers. We hold that all gains here involved, from sales of portions of the Stenton Avenue Tract, are taxable as ordinary income under section 22(a). Cottman and Bustleton Tract - Eastwood Street Property On the basis of the facts found respecting this tract, we are of the opinion that the particular portion of the tract here involved was, at the time sold, held for sale to customers who were expected to be builders of row houses. Notwithstanding the wording of the partnership agreement between Metz and Zerbey, no portion *61 of the tract was ever held passively for investment - to the contrary, its development for sale to customers was both methodical and active. As soon as the initial financing had been completed, the partners contacted the zoning board, for the purpose of having the tract rezoned to permit the construction of row houses, which they considered to be the most profitable form of development. They then procured the introduction of a city ordinance to effect such rezoning. They worked with the city officials in preparing a subdivision plan for a layout of streets and lots, and in having such plan approved and recorded. Immediately thereafter, they established a front-foot price schedule for sale of the lots, and listed them with two realtors who specialized in property of this character. And, when sales did not materialize, they decided to stimulate interest by erecting a number of row houses on the tract. All these circumstances reveal a definite and continuing plan of the partners to hold the property for sale as real estate developers. The subsequent distribution by the partnership of portions of the tract to Metz and to Zerbey individually did not effect any change in the purpose for *62 which the property was held; it reflected merely an intention of the partners to continue development operations separately, in respect of limited portions of the entire tract. Neither before nor after the distributions from the partnership, did either Metz or Zerbey intend to hold their distributed portions passively. Metz's sale of his portion to his controlled corporation was for the purpose of accomplishing the construction which was expected to stimulate sales. The fact that the sale was to his own building corporation, rather than to another builder, is not material. Accordingly, we hold that the gain which Metz realized was from property held by him for sale to customers in the ordinary course of a real estate development business; and that such gain is taxable as ordinary income under section 22(a). Walnut Lane Tract This tract was the first vacant land which Metz had purchased for other than immediate use in his building operations. He was able to obtain it at a low price. He believed that he could hold it until after the war without risk of destruction, and then either sell it for a greater price or use it in connection with his construction business, depending on *63 whichever course then seemed best. He at all times held it passively, without either offering it for sale or placing any "for sale" sign upon it. He did no building on the property. In June 1944, after a holding period of approximately 18 months, he sold one portion to a banker; and in December 1945, he sold the remainder to a construction company. In our opinion, neither the manner in which Metz held the property nor the manner in which he sold it, indicates a purpose to hold it other than as an investment. The two sales were unrelated transactions for the liquidation of such investment. They were not of sufficient frequency, continuity, or substantiality to be characterized as sales made to customers in the ordinary course of a real estate business. We hold that the gains derived from these sales were long-term capital gains within the meaning of section 117(a). Stenton Gardens, Inc. - Pleasant Place Apartment Project Stenton Gardens, Inc. was organized by Metz in 1942 for the purpose of constructing and operating an apartment project, in order to provide him with a source of income over an extended period. With a view to attracting and holding tenants, the apartments *64 were built with better than average material, and with a separate heating plant in each apartment. The use of long-term blanket financing and the installation of a common gas main for the entire project indicate a plan to operate the units together, rather than to sell them to customers. Also, offers received for the purchase of various units and apartments were rejected. There appears to be no doubt that the project was built and held, at least until the beginning of 1947, as an investment and not for sale to customers. In January 1947, the corporation decided to liquidate its investment, and since there was no ready market for the project as a whole, preparations were made to sell the units separately. This decision to liquidate was prompted by the poor earnings record, due to the low ceilings on rents and inability after vigorous effort to have these ceilings raised. Does such action indicate a departure from the original purpose to hold the property for investment? We think not. Any taxpayer may liquidate his investments, and to do so must sell. He may sell in any way that seems most advantageous to him; and gains from the sales will be entitled to capital gain treatment so long *65 as the method of disposal does not constitute entrance into the trade or business of selling such properties. See Home Co. v. Commissioner, 212 Fed. (2d) 637, 641, affirming a Memorandum Opinion of this Court [12 TCM 741]; and Curtis Co., supra. We turn, therefore, to a consideration of the manner in which the sales of apartment units were handled. Arrangements first were made for freeing the separate units from the long-term blanket mortgage; and for installation of separate gas meters in each unit, with easements which would permit the units to continue to use the master gas main. These steps were required because the project had been planned for operation as a whole, with the individual apartments being rented and not sold. Letters announcing the decision to sell were sent to the tenants and also to persons who, at earlier dates, had made unaccepted offers to purchase units or apartments. Although this indicates some sales activity, the degree of such activity falls short of that which normally characterizes the entry of one into a real estate business. It was not supplemented with any advertising; and even attempts of an independent *66 realtor to advertise were met with a reprimand and directions from the corporation that the same be discontinued. No "for sale" signs were placed on the property. No tenant was requested to vacate his apartment. And units were offered for sale only when one or more apartments in a unit had become vacant. The total number of sales was fairly substantial, particularly in the second year. But there were 48 units to be sold, and these were not completely disposed of until 7 years after the liquidation began. In most of these years the number of sales was relatively small; and in each of the fiscal years 1950 and 1951 only one sale was made. Capital gain benefits are not to be denied, simply because a taxpayer has a large number of units to dispose of. Walter R. Crabtree, supra. It is not improbable that to interest an individual or group of individuals in the purchase of a large project may entail more activities having the characteristics of a business, than acceptance of individual offers as they occur. Frieda E. J. Farley, 7 T.C. 198. It is our opinion that the corporation, in selling the properties used in its rental business, was not holding them primarily *67 for sale to customers in the ordinary course of a real estate business. Rather, it was engaged in the orderly liquidation, as promptly as possible, of a rental business which had proved unprofitable. We hold, therefore, that the gains realized by the corporation from sales of its apartment units should be regarded as gains from sales of real property used in the corporation's rental business and held for more than 6 months, within the meaning of section 117(j), Internal Revenue Code (1939). Cliveden Street Lots and Fayette and Upsal Streets Lot As stated in our findings of fact, no evidence was presented by the petitioners with respect to the Cliveden Street lots and the Fayette and Upsal Streets lot. Therefore, as to these, we sustain the determinations of the respondent. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Carl E. Metz and Helen Metz, Docket No. 37525↩